## Nikas Estate

*Nathan Teitelman*, for accountant.

*Judith J. Jamison*, Special Assistant Attorney General, for Commonwealth.

BOLGER, J., January 25, 1962.—Decedent died July 23, 1957, survived by a widow, Katerina Nikas, two daughters, Lime Dudi and Frosina Nikas, and a son, Koco Nikas . . .

By his will, a copy of which is annexed, decedent authorized his executor to conduct his business or to sell the same. He gave his entire residuary estate in trust to pay the income annually to his wife and children for a period of ten years after his death. In his discretion, the trustee may pay during the continuance of the trust an amount not to exceed $1,000 of principal during any year. During the administration of the trust and so long as she lives, all of the income is to be paid to his wife, Katerina Nikas. At the ex-

piration of ten years, principal is to be distributed to his wife, if living, otherwise to his three children and the issue of any who might then be deceased per stirpes. He appointed Sophia Dadaris executrix and trustee, and his friend, Alexios Dimas, substituted executor and trustee in the event of her death or resignation.

The wife and three children are residents of Albania. There is no question concerning their identity and existence. The problem is a narrow one and involves the Acts of July 28, 1953, P. L. 674, and the amendment to the Fiduciaries Act of 1949, the Act of February 23, 1956, P. L. (1955) 1084, sec. 6.

In this case, with the permission of the court, the accountant visited the widow in Albania. Her visit took place in May of 1960. She took $675 and purchased clothing and medicine in this country and took them with her. She also took $250 in cash. Mrs. Nikas is the sister of the accountant. The witness testified that she had no difficulty with customs in Albania. She declared the value of the goods on entering the country and stated that they were intended for her relations. The articles were packed in three trunks which arrived with her. No one interviewed her after the articles had been delivered to her sister and her sister's family. She also stated that she went to the bank and exchanged the $250, which was in American currency, for leks. The witness then testified concerning purchases which she made with the money, principally food which was bought in a store in the vicinity of her sister's home.

Peter Pappas, who was not related to decedent, a United States citizen who served in the armed services of the United States from 1942 to 1944, visited his family in Albania from April of 1960, to August of 1960. His family consists of his wife, his son and two daughters, who are all residents of Albania. This witness testified that he took five trunks containing mer-

chandise worth about $2,100, consisting of clothes and other goods. He had no difficulty in delivering them to the home of his family, but was obliged to declare that the merchandise was intended for his family. This witness testified that he also brought a substantial sum of money all of which he declared on entering the country and most of which he spent while in the country. The witness testified that he spent almost $5,000 after the American dollars, consisting of American Express travelers checks, had been transferred into leks. This witness testified that there are two different types of stores in Albania. In the one store, instead of receiving leks, he received voluti at a very favorable rate of exchange. With voluti he was able to purchase American goods. As a tourist he would receive the equivalent of 125 leks per dollar, whereas in voluti leks, a native of Albania can receive 150 leks for each American dollar. This witness testified at length concerning commodities and the prices charged therefor. He testified that when he left the country, he gave his wife $2,000 in American Express travelers checks which she periodically takes to the bank and receives voluti leks in exchange.

Another witness, Louis Dimetri, a citizen of the United States, testified that he visited Albania from May until September of 1960. His wife is a resident of Albania. This witness also testified that he brought a substantial sum of merchandise and also a good deal of American dollars and that he dispensed the latter while visiting various nieces and nephews in the country.

The witnesses testified candidly without coercion and the auditing judge is convinced that the facts to which they testified actually occurred in Albania during their visits. Despite this testimony, the auditing judge does not believe that a resident of Albania today can have the full and complete use and enjoyment.

It is entirely a different matter to have a relative visit the country having in his possession American dollars and American goods than it is to depend upon the good will and relaxation of the right to possess property when the same is sent by the ordinary channels. It is obvious that Albania in establishing the so-called voluti bank, which is evidently a prototype of the P. K. O. in Poland, is doing so for the sole purpose of procuring American dollars so badly needed for the Albanian economy. It is just as obvious that the treatment afforded the witnesses who testified before me was slanted for the same purpose.

Consideration must also be given to the fact that every witness who did testify was very naturally and vitally interested in the welfare of his family remaining in Albania. Although none of the witnesses evinced any deceit or duress, they nevertheless were activated by their sincere concern for the welfare of their loved ones.

The Commonwealth of Pennsylvania presented as its witness Kemal Vokopola, legal analyst in the Law Library of the Library of Congress. He formerly had been a practicing lawyer in Albania and is now engaged as an expert in the European Law Division of the library to analyze, digest and translate Albanian laws. He is associated with Dr. Gsovski, who appeared as a witness in Zupko Estate, 15 D. & C. 2d 442.

The witness testified and subsequent facts have proved that the government of Albania is a dictatorship based essentially on the principles of the Stalin Constitution. He documented his testimony by submitting excerpts taken from specific enactments of the government whereby private property both real and personal has been "nationalized" without compensation.

It was his conclusion that the supremacy of the government in controlling not merely property, but per-

sonal freedom of the people is more rigidly imposed in Albania that it is in Russia. Parasitism is a crime. Its penalty can be banishment to a concentration camp.

He emphasized the fact that there are no diplomatic relations between Albania and the United States. As a result there is no obligation in the Albanian government to recognize judgments or decrees of any court of the United States.

The State Bank is the only medium through which foreign money can be exchanged. In 1950, by a single order, the Albanian government cancelled all credits of all Albanian citizens in the State Bank for no consideration. This was confiscation. The same thing could happen again and at any time and could relate to an individual as well as a group of citizens.

It is thus apparent that all that was written by me pertaining to Russia in Zupko Estate, supra, applies with equal force to Albania.

The United States of America through its diplomatic services is well equipped to inform its own Treasury Department of conditions existing currently in any country even though as in Albania there are presently no diplomatic relations, not even a consular office. In all fairness to persons who now reside in Albania who may be entitled to receive veterans' benefits, social security and possible pensions, the Federal government at the earliest moment that it considered such persons as having the ability to fully enjoy that to which they are entitled, would release the funds.

Respecting Albania, no funds are being remitted by the United States Treasury. This is a fact which is not denied and is more than sufficient for me to conclude that the balance of the funds in this estate must be sent to the State Treasury without escheat.

The court takes judicial notice of recent developments within the Communist world, particularly affecting Albania. These events include the action of the

Albanian government in drawing closer to Communist China and the severing of diplomatic relations with the U. S. S. R., with the result that the people of Albania have greater restrictions put upon them and their way of life than the peoples of any of the other Iron Curtain countries. The iron heel of the State is more controlling of the everyday life there than any of the other satellites. As above stated, funds sent from this country must be sent to the State Bank before they reach the beneficiaries. This divests the Albanian national of all control of the funds and places that control fully in the hands of the government. This circumstance added to the diplomatic tactic over which this court has no jurisdiction to question any diplomatic official of a foreign country to whom funds from this court are committed for transmission abroad, prompts the conclusion that there is little likelihood of such funds being enjoyed by Albanian beneficiaries and of any satisfactory investigation to determine whether such funds reach their intended destination.

In the account as supplemented, the accountant requested reimbursement from this estate for money expended from her own personal funds as distributions to Katerina Nikas. These total $3,771 and cover a period from January 29, 1958, through October 4, 1960. The Commonwealth objected to reimbursement for any funds advanced subsequent to an initial hearing held in this case in May 1959. Such funds as were advanced subsequent to that date cannot be charged against the estate . . .

Leave is hereby granted to the accountant to make all necessary transfers and assignments.

And now, January 25, 1962, the account is confirmed nisi.